In the brief time we have available here, Mr. Porter wishes to emphasize some of the key evidentiary shortcomings in the government's case, as he challenges the sufficiency of the evidence and also has to show harm with respect to the opinion testimony given by federal agent DeMond Lockhart, which we believe was improper. During opening statement, the government made a series of promises to what it was going to show against Mr. Porter, and it failed to deliver on every one of those. For example, the government said that it was going to show that Mr. Porter and Mr. Guyton had a, quote, series of meetings at the Frenchman Street address, and that after every single one of these meetings, Mr. Guyton was heard to call his customers and say, I've got some fresh seafood. Maybe he's got heroin. In fact, Mr. Porter and Mr. Guyton encountered each other four times at that Frenchman Street address during a nine-day period, and never once during that nine-day period did Mr. Guyton follow a meeting with such a call. There was one call about him having seafood, and it occurred three hours before Mr. Porter showed up at Mr. Guyton's door for the apparent purpose of driving him to the local bar and getting off there. Now, don't you claim, as part of your insufficiency argument, that there was insufficient evidence that Mr. Porter was the person who was called T? Yes, we do. And what basically the only support they have for that, besides the fact that there are people or there's evidence that he has been known to go by that nickname, T, besides that these circumstantial arguments they make that, in the end, didn't even pan out. There was no circumstances that support his activity in heroin dealing, so that the jury could not simply rely on the fact that there was a T involved. The T reference is made twice, both by Mr. Guyton, once in a recorded call and once in an alleged conversation that he had with Mackenzie Weber. The only time we've ever heard, there's no evidence that Mr. Guyton ever called Mr. Porter T. The one time he does mention Mr. Porter, and we know he's talking about Mr. Porter, he calls him Disco. On the other hand, there's a good deal of reason to believe that T, there's at least two other T's in this case, that one of them is the most likely candidate for T is Terrence Henderson. We know that Terrence Henderson provides heroin to Mr. Guyton, and better yet, we know that Mr. Heroin, at least on one occasion, I'm sorry, Mr. Henderson, provided bad heroin to Mr. Guyton. So, the one reference to T by Mr. Guyton in the phone call is about the guy who brought him bad heroin. So we would suggest that we don't have the circumstances that enable the jury to conclude that T is Mr. Porter. You know, the government said in opening statement that Mackenzie Weber was going to testify that he personally witnessed Mr. Porter deliver, quote, present nine ounces of heroin to Mr. Guyton on May 4th, and that that testimony would be corroborated by the testimony of surveilling agents. We've detailed in the brief and in the reply brief how the government's failure on that claim was rather epic, and that in the end, Mackenzie Weber's testimony only squelches the speculation that Mr. Porter delivered heroin to anybody, a speculation that was fueled only by Agent Lockhart's opinion testimony. One of the big points that the government relies on is this call where, well, what the government tells the jury in opening is that Mr. Guyton's talking to his customers about the bad heroin he's just given them. And Mr. Guyton tells them, well, I'm not going to deal with Mr. Porter anymore. And then he calls Mr. Porter and he says, we got, you know, you've given me bad heroin. We got to go back. We got to go back. Something's got to change. And as the government even says in its brief, he said, we got to go back and return the heroin. Well, this is not what happened. I mean, it's just not even close. Mr. Guyton is in the park, City Park, with his daughter, Maddie, which is a point I kind of miss when I was writing the brief. He's there with his daughter. He's getting texts from the Greens. The Greens are a couple who buy, we are told by the government, a gram of heroin from Mr. Guyton every single day. So after feeling these complaints on the telephone, he calls Mr. Porter and says, we got to go back, bro. And Mr. Porter says, where you at? And he says, I'm at City Park. And Mr. Guyton, Mr. Porter says, well, all right, I'm at such and such. I'll call you when I get out of here. Mr. Guyton then calls somebody on his special phone. It's a phone we are told that he only uses to call his St. Louis supplier. And he says to an unknown person, we never know who that is, he says, man, your main man just don't want to do right. And they talk about the bad heroin. And then they talk about, and then he says, I'm going to bring it to you in a minute after I get done with my little girl. So there's no mention in this conversation, either coded or otherwise, who the identity of the person who's supplying this bad heroin is. So all the government has to rely on is the fact that he calls Mr. Porter and says, we got to go back, bro. And we would argue that that's just not sufficient to put this man in jail for all this time, particularly when we know this. He's with his little girl. He says, we got to go back. We already know that a few days earlier, he relies on Mr. Porter to transport him from one place to another. So he said, a likely interpretation of this three word phone call or four word phone call is he wants to ride back, which is also fitting with the response that Mr. Porter gives to him, which is, well, where are you at? Regardless, aren't you also raising a sentencing issue? I am. Is somebody else going to argue that? Yes. Yes. That would be Mr. Seibert. Anyway, we believe that this where you at, bro, which is a big part of the government's case, cannot support Agent Lockhart's testimony that where you at, bro, is drug jargon, drug code that means we have to bring the heroin back because my heroin customers told me in previous calls that it wasn't good quality. Now the government connects or promises to connect my client to one other person, Harry Berry. And the government says in the opening statement that Harry Berry is coming back on June 12th with heroin he's gotten from Houston. And that's what he did. He was in Houston where he had been done several times with some heroin. And he calls my client to, quote, arrange a meeting, and then they have a meeting in the middle of the night. Well, it turns out that this meeting occurred at 4.30 in the afternoon. There was no meeting in the middle of the night. And what we also learned from the government's own witnesses is that Harry Berry and my client are best of friends and that their connection goes beyond any heroin dealings. They play basketball together on a recreational organized league, and they talk about basketball all the time. In fact, the call that leads up to this particular meeting was nothing about anything but basketball. Not even Agent Lockhart tries to make this call to be a drug-related call. And during this call, he says, and come on over and watch the game. Well, this is the call, Your Honor, that forms the basis for the facilitation conviction in this case. We believe that the, you know, all they have here, I mean, there's no, my client's caught, he's not caught with any drugs, he's never seen delivering any drugs, et cetera. The government says he lived in a house that he couldn't possibly afford, his wife couldn't possibly afford. This isn't true. You know, just, if you read the PSR, his wife bought the house in 2003, four years before they even got married. The house is worth $216,000, has a $150,000 mortgage on it. Mr. Is this evidence that the jury heard? Well, what the jury, here's what the jury heard. The jury, well, the jury was told that she wouldn't be able to afford it. Well, what the jury heard was that she has, she has her own business. They don't say how much she makes. They also hear that Mr. Porter, you know, he doesn't file income taxes, but he has, there's evidence that he, that he has had jobs outside of the heroin dealing business. And yes, his home has granite countertops and his wife likes shoes. Was that argued by the, by your side to the jury that that's not fair or true? Oh yes. That's, that's the subject of, of Mr. Porter's cross-examination is that, you know, you know, did you know that this house belongs to his wife? Did you know that, you know? The jury got to hear that it's a $250,000. No, they did not hear about the house. I'm just. Why not? Why, why did they not hear that? Was it, was the house, did the government put the house out there, right? Pictures. Yes. And that's why counsel didn't follow up and say, she owned the house already. I mean, that seems very, yes. And you know, we would fault counsel for that. Counsel asked, did you know that his wife owned it? And the witness who's on the stand at that time says, no, I didn't know. And that's all he gets in terms of evidence, but all right. Thank you. Thank you.  I'm going to let you save time for rebuttal. Mr. Seibert. May it please the court, my name is Jordan Seibert and I represent Clarence Haynes, who's also defending this case. He raised three issues in the brief. Improper designation of the case agent as an expert, insufficiency of evidence, and a sentencing issue. I'll start with the sentencing issue, which was that the district court improperly applied a 20-year mandatory minimum when Mr. Haynes had a guidelines range that was below that under the guidelines as they now exist with the retroactive amendment. And that the district court's application of the 20-year mandatory minimum was erroneous because for two reasons. First, it was contrary to this court's precedent in Ruiz, which said that the tests for triggering a mandatory minimum in a drug conspiracy case is you have to determine the amount that is attributable to the individual defendant plus the amount that is attributable to the co-defendants or the co-conspirators that could reasonably be foreseen by that individual defendant. In this case, the district court never applied that test, either the judge or the jury. And of course, that also is a constitutional problem because Alain now says, which didn't exist at the time the jury returned its verdict, that that finding has to be made by the jury, not the judge. So those two cases together clearly show that there was an error in the application of the mandatory minimum. I can't remember. Did you preserve that? Yes, Your Honor. Mr. Haynes' attorney argued Alain in a sentencing memo that he submitted to the court. The gravamen of the memo was admittedly an argument that's since been rejected, which is that Alain somehow says something about guideline application, which isn't true. But he did identify Alain as a rule that says the jury has to find facts that increase the mandatory minimum. Then he showed up at the sentencing hearing and tied that together with a case from this court that says exactly what Ruiz says. It doesn't cite Ruiz, but it's the Urizquieta case that also says you've got to look at the amount attributable to the individual defendant and reasonably foreseeable for co-defendants or co-conspirators. Is it correct that at the actual hearing that the objection was re-urged specifically regard to mandatory minimum and that he then said, don't hold me accountable except for what my portion is? That's correct, Your Honor. So that seems fairly specific. It's quite specific. Mr. Williams, who is the attorney for Mr. Haynes, said we, and I'm quoting the transcript, we would re-urge the objection with regards to the mandatory minimum. And so the only objection he's made regarding the mandatory minimum is Alain. And then he goes on to expand on that by saying, and we direct the court's attention to a federal case, and he cites Ruizquieta, which the government now concedes was the case he cited. He says kind of a different version of the name in the transcript, and then he says, in which the evidence presented at trial, he says the findings were that just because there was a conviction for a certain amount doesn't automatically trigger the mandatory minimum, and for sentencing purposes, the defendant is only accountable for all the quantities of marijuana, in this case it's heroin, which he was directly involved. The same thing as responsible or, I mean, the court could see that he's saying I'm only responsible for my part and what's reasonably attributable to me, especially with the case size. Correct. And Mr. Haynes followed up with that himself. He made that point himself twice during his allocution. They're very knowledgeable clients. Mr. Porter also gave a whole thing himself that may have preserved his claim. Go ahead. He did. And Ms. Porter also did that in his attorney mentioned Elaine as well at his sentencing hearing. So I think in both cases it was preserved. And then even if it weren't, it would still be clear error because this court, this panel is bound by Ruiz to hold that that is the test. There's no intervening authority to say it's some other test, and Elaine says that test has to be applied by the jury, not the judge. So I think it also would affect Mr. Haynes' substantial rights because he had a below guideline. It happens on resentencing if we agree with you. I think on resentencing there would be a new PSR prepared by the probation officer subject to new objections under Rule 32 because in Mr. Haynes' case the judge found that all of the sentencing disputes were basically mooted by the higher statutory minimum. Right. But so there's the statutory minimum that is off the table because you can't go back and get the jury to do the reasonable quantity. Is that the situation? That's correct, Your Honor. I believe so. Without the quantity finding, my client would be subject to 841B1C, which would be ordinarily a range of 0 to 20 years, but with the bill it would be 0 to 30. And I think it would be the same situation for Mr. Porter. So I just also wanted to mention as well the problem with the expert testimony. In this case, the case agent was qualified as an expert and testified based not on some knowledge that he had about, let's say, what the word crawfish meant when he had dealt drugs undercover on the streets of New Orleans, but on his review of the evidence in this case. So he said, if you look at pages 3145 to 3154 of the record, you'll see that he explains what the word crawfish means. Crawfish starts with a C. Cocaine starts with a C. But he says it means heroin. How does he know it means heroin? Because before the phone call was made where they used the word crawfish, he says that he tracked with GPS the person on the other end of the call to St. Louis. And on that person's way back from St. Louis, he heard him on the phone on another wire tap, and the case agent drew the inference that he tried to buy heroin there and was unsuccessful. Assuming, Arguendo, that you were correct, and we've got the Aiken case and other cases that are problematic for you, why isn't the error harmless with respect to your client as opposed to Mr. Porter that might be a closer call, but your client, certainly, why isn't it harmless? Well, I think with Mr. Haynes it's not harmless because the government really had to rely on the interpretations of those ambiguous phone calls in order to put together what they believe was sufficient evidence. What is the other sufficient evidence in the record with respect to Mr. Haynes? Mr. Haynes was found one time with seven grams of heroin, but that doesn't put him into a conspiracy. Certainly not one for over a kilo. And also, we know, the case agent admits on the stand that Mr. Guyton also dealt marijuana and also dealt cocaine. And so, with Mr. Haynes' case, if the word crawfish doesn't mean heroin, then suddenly we have a problem because to infer that it must mean some other controlled substance, you can't affirm on that basis because that would be a constructive amendment of the indictment, which only lists heroin. Ordinarily, the drug type and quantity is only a functional equivalent, but when the indictment chooses to only list and identify one drug, the government cannot suddenly change its theory on appeal in order to win an affirmance. What case is that? Well, we cite Daniels. Daniels, in turn, cites, quotes, Robles-Vertiz. Daniels has it as saying, constructive amendment occurs if the jury is permitted to convict on an alternative basis permitted by the statute, but not charged in the indictment. And I'm seeing, I see I'm out of time, but Robles-Vertiz cites Sterone v. United States. All right. Thank you, Mr. Haynes. Thank you. Ms. Ivory, you've saved time for a vote. Ms. Conner? Good afternoon, Your Honors. May it please the Court, Rachel Conner on behalf of Jose Ytorres Bonilla, for the same reasons as previous counsel, because of the time constraints, Mr. Ytorres Bonilla did raise seven claims of error in his brief, however, I'm going to devote the primary amount of my time to the sentencing issues, particularly the Apprendi Elaine Turner issue. By way of a brief factual background, Jose Ytorres Bonilla was charged along with co-defendants Clarence Haynes and Raymond Porter with conspiring with intent to distribute a kilogram or more of heroin. The conspiracy allegedly occurred from January 2010 through November of 2011. There were a number of transactions, there were a number of different interactions that were surveilled over that time period, however, Jose Ytorres Bonilla, the first time that he appears is in June of 2011. So in a conspiracy that allegedly took place for 22 months, Mr. Ytorres Bonilla's involvement is in the last five, approximately. The reason that's significant, obviously, is because as is stated in the Ruiz case, these conspiracies frequently involve substantial amounts of time with multiple participants and different conspiracies, and so an individualized determination is much more, an individual determination of a defendant's specific responsibility in terms of the quantity of narcotics is obviously very important. The jury found in this case that the entire conspiracy from January 2010, 18 months before Jose ever shows up, until November 2011 involved a kilogram or more of heroin, and the effect of that finding by the jury was to shift the entire sentencing range from 0 to 20, which is heroin, to 20 to life. And I think that this case particularly illustrates the unconstitutionality and the unworkability of requiring a conspiracy-wide finding. You don't have this preserved. Well, I would argue that we do have it preserved. Trial counsel did object to the quantity. He requested a below guidelines range, which would have been, for him, capped at 20 years. He repeatedly said that he was only responsible for 406 grams. The client himself made an argument that he was being sentenced in violation of the Sixth Amendment. I would also argue that in this case, the government itself submitted a verdict sheet to the court prior to deliberation that would have asked the jury to find whether or not there was a conspiracy involving heroin, and then broke out each individual defendant and asked them to find whether or not there was up to 100 grams of heroin, 100 to 999, or a kilogram or more. And the court declined to use that verdict sheet and instead used a verdict sheet that simply asked if the entire conspiracy involved a kilogram or more. So, I mean, now the government has a position that's new, and I'm sure they would insist that they have to have that specific question next time. But if it's not objected to, and the other one is submitted, and y'all don't preserve it, then it seems like you're in a tough spot. I think it was ineffective not to preserve it, but there's an argument, I believe, that the justification, the rationale for requiring that there be a contemporaneous objection is so that the trial court, the district court, has an opportunity to rule at the time and to correct any errors that come up. So I know this is a little bit wrought, but I believe that the government's submission of a verdict form, which would have allowed for individualized determinations, and the purposes of your review. In this case, Jose Torres Bonilla was sentenced above what I believe the statutory maximum is. I would ask that this court re-evaluate its holding in Turner. I believe that it's clear that Turner doesn't really apply in terms of the mandatory minimums, where there's been an individualized determination of someone's quantity, and it comes up below the sentencing range this court has held in Guerras-Creda and Guajarato, and at that point, you can disregard the range that the jury found. And I believe in Alain, Justice Thomas overturned 13 years of precedent in Harris and found that there was absolutely no distinction between a mandatory minimum that's applied in aggravation and a factor that's used to aggravate the penalty above the statutory maximum. But we don't have to overturn it if we just apply our rule of orderliness, right? Because Ruiz would say the prior rule ahead of time, and now the government's agreeing with you in every future case anyway, I would assume, based upon their new policy. So wouldn't we just follow Ruiz? I believe you would follow Ruiz, and if Ruiz is controlling, then I believe that there's plain error in this case, because the rule would have been obvious to the district court. So Mr. Eterrez-Bonilla is asking for sentencing relief. All right. Thank you, Ms. Conner. Ms. Copes? Good afternoon. I think it is your honors, and may it please the Court, Dianne Copes, for a moment of silence on behalf of the government, and with me is trial counsel Sharon Lieberman and Kevin Boydman as well. And I would like to start with the argument that we are in a bit of an odd situation, and that is, what did Elaine do, if anything, to this Court's presidential ruling in Turner? And what Elaine and Apprendi said, both of them, one on the statutory maximum, one on the mandatory minimum, is that the jury must make a finding. And that was a simple finding on the statutory maximum in Apprendi, because that was the statutory maximum. On the other end, in Elaine, this is a gun statute that we're all familiar with, and it was a moving mandatory minimum. In an ordinary drug case, you might have a charge of simple possession with intent to distribute. And that would say, defendant possessed with intent to distribute on July 4th 400 grams of heroin, or whatever, and you've got a number. But drug conspiracies present a conundrum. And we believe that the answer to that is the Turner decision, because it talks broadly in terms of statutory maximums. And here's the issue, and here's our concern. While we support individualized finding, we believe that Turner controls, and it says you must make a conspiracy-wide finding for a drug conspiracy. It's been reaffirmed post-Elaine in both Aikens and Daniels as to the conspiracy as a whole finding, which is what we had on the jury form, special verdict, conspiracy-wide finding. Here's the conundrum. If you say that there is a defendant-specific finding that's necessary as well now, you're going to have a jury form with two blanks on it, and one of them is going to be irrelevant, and here's why. Because the conspiracy statute is a range, and it's based on drug quantity. And they go together in lockstep. So if you know the mandatory minimum, you know the statutory maximum. On the other hand, if you know the statutory maximum, you know the mandatory minimum. And let me just give you the statute that was set by Congress, and our concern is ending up with a sentencing range for drug conspiracies that is outside what Congress said. If a maximum, yes, statutory maximum of 20 under Apprendi, jury finding, conspiracy-wide, then your mandatory minimum, according to Congress, under 841B1C, is zero, zero to 20. If you have a small amount, less than 100 grams of heroin, okay, so you have zero to 20. If you have, if it's governed by the conspiracy-wide, they move in lockstep together, so the mandatory minimum sets it, it's zero to 20, or 5 to 40, or 10 to life. Same thing happens with the statutory maximum. The statutory maximum sets one end of the range. Then you already have the other end, and you know it. And that's the range that's set by Congress, and it didn't set any others. It didn't set one for a defendant-specific finding and a conspiracy-wide finding, and one's going to govern the mandatory minimum, and another's going to govern the statutory maximum, and let me give you an example of the problem. With Mr. Echeres Bonilla, and whether or not they preserve the issues as discussed in our brief, I'm not really going to go there, because the question is, what are we going to tell prosecutors, because we need to know what to charge? What are we going to tell the defense, because in Alaine, the court was particularly concerned with the indictment giving notice to the defense of both the minimum and the maximum. What are we going to tell the judges to instruct? What are we going to tell the juries to find, and what is that special verdict form going to have on it? And under Turner, it says only conspiracy-wide, and we believe that that case is precedent it has been reaffirmed, like we discussed in Aikens, and also in the Daniels opinion, and it says conspiracy-wide sets the maximum. Well, if the maximum is 20, Congress tells us the minimum is zero. If the maximum is 40, Congress tells us the minimum is five. If the maximum is 10 or 20 for drug recidivists, then Congress tells us that the mandatory minimum is 10, or 20, I'm sorry, not good with numbers here, 10 to 20 to life. When you read the statute, you can see that B1C, zero to 20, B1B, five to 40, B1C, 10 to life, and that's the conspiracy conundrum that we believe was answered in Turner, and that's why while, as a matter of policy, we support defendant-specific findings, we think you've already held in Turner that that doesn't happen, that it's a conspiracy-wide finding. But regardless of what you do . . .  We have many cases that say reasonably foreseeable to him before Turner. Well, Ruiz and everything, actually before Alleyne, often sort of used the same, interchanged and used the same language of the guidelines for relevant conduct, 1B1.3, and indeed, Guiris before Alleyne, the judge could make that finding. And within the statutory range set by Congress, the judge still can. The issue is for a drug conspiracy, what does the jury need to find? That's not answered in Alleyne, and that's not answered in Apprendi, and that's the conspiracy problem. But if it was already the law in the circuit that you had to do only what was reasonably attributable to the defendant, then it doesn't . . . I mean, Alleyne is helpful, then, to the defendant again, but they don't even need Alleyne to get what they're asking for. Ruiz was decided pre-Apprendi. It was overruled largely by Doggett on whether the jury or the defendant should be held liable for this, of the statutory maximum, because it said the judge does both. And it hasn't been cited post-Turner, and really considered, except for in 284F Appendix 126. That's the one case we found post-Turner, and it didn't even cite Ruiz for this issue. But Coroz Hernandez said this. Medina says this. Aikens, in 2014, says attributable to the defendant, doesn't it? Aikens has several parts where it talks about what needs to be shown, and I have it right here. Give me a second. It starts out by saying, the court has explained that even post-Apprendi, the burden does not, now I'm on page, I'm on page 607, 746F3rd. The burden does not extend to the individual question of whether drug quantity was attributable to a particular defendant. The government need only allege and prove the bare facts necessary to increase the statutory sentencing maximum for the conspiracy as a whole. And then it cites. But then it says attributable to defendant as it's discussing it. Well, in this case, and there is, there are differences between the districts here. That's why the biggest thing we need is guidance. And we don't really have a dog in the hunt here except that we believe that Turner precludes us from conceding. So, and, but we do urge that if you're, if you're going to, if you're going to make a defendant-specific finding, make it the only one. If you're going to make, conspiracy-wide, make it the only one. But let me give you an example. You said, you gave some examples, but they just mean that it's superfluous. We have lots of jury instructions where you don't end up needing one if you have another one. So what's the problem with having superfluous ones? If you, the problem is confusion to the jury, and the very problem — Many things, where we ask 20, 30, if you ever charged a jury in Texas, you can get 35 combinations and permutations of different kinds of questions, and if you answer one and the jury answers tons of different questions, and then the judge has to go back and put them together. The jury, according to Apprendi and Allain, must make, must make the fact findings that govern the sentencing range. So they make the findings, and then the judge says, I can do this with this finding, and that one I ignore, but this one controls. The juries have to find the statutory sentencing range, and there is only three ranges set by Congress. I guess I'm not, we're not communicating very well. To say that something's superfluous once it's found because the other jury's also found something else, is it meaning that the jury's not finding it? I don't understand why they can't do both findings. Because they move, I'm sorry, Your Honor, because they move in lockstep together. If you, if you, looking at the statute, if you have one, you have the other. It's 5 to 40. It's 20 to life. It's 1 to 20. It's not 1 to life. And if you say that the mandatory minimum could be 0 to 20, but the statutory maximum is 20 to life, you end up with a range of 0 to life, and you end up with, in our courthouse, one judge who's going to give a drug co-conspirator probation, and another one who is very drug, he doesn't like drug dealers, and he's likely to give life. That's a problem that needs to be fixed, perhaps, but that's not for the court to say, don't make individualized findings like Eileen says to do. That's just, and isn't the DOJ asking you to take a particular position here? Not if there's controlling authority that requires a conspiracy-wide finding. I can't ethically get up before you and argue something that isn't the law as we analyze it. If you say, if you disagree, then make it defendant-specific. If Turner doesn't control, but make that the finding that the jury makes on the form. Because if you have both of them, conspiracy-wide is superfluous under the statute, because this mandatory minimum sets the 5. It sets the 0. It sets the 20, and then you have 20 to life, 5 to 40, and it's not for the district judge to decide those ranges. Those are set by Congress, and it would be judicial legislating to find different, a 0 to life possibility, and that goes entirely against the Elaine idea that they need to know what they're facing the defendants do in the indictment. And Congress only has set ranges, and we need direction, and the defense needs direction, and judges need direction, and jury needs direction as to which one of these is going to determine that range. But it's either going to be 5 to 40 or 20 to life. Now, the judge within the 0 to 20 or 20 to life has sentencing guideline discretion to make determinations, but these are statutory ranges that must be found according to Apprendi and Elaine by the jury. And if the jury finds one side of the range, it has found the other side. So most of all, we just ask you to say it's either defendant-specific or conspiracy-wide, because otherwise you can, in Mr. Attiris Bonillas' case, there was a conspiracy-wide finding under Turner that would set the outer bounds. But if Mr. Attiris Bonillas, because there was no defendant-specific finding, ends up with 0 to 20, then Mr. Attiris Bonillas is going to have a 0 to life, and that is not provided by Congress. That would be judicial legislating, because there's only these lockstep ranges that move together. And if you say Turner applies to the mandatory minimum or statutory maximum, we've answered the mandatory minimum. And you'll see that when you look at the statute. And this only comes up with the conspiracies, but in other cases, there will be a set drug amount for a defendant. But in this case, the question is, and in the Randall case, Judge Elrod, you stated it precisely, whether the defendant should be sentenced based on the amount of drugs attributable to the conspiracy as a whole, or only the amount attributable to him individually. And what we're saying is there can be only one, you know, one finding, which is consistent with whether a sentence should be based on the amount of drugs attributable to the conspiracy as a whole, and we're looking at the jury form, or only the amount attributable to him individually. And the court must decide whether Turner controls or Ruiz controls in order to figure out which of the statutory ranges apply. Do you maintain that Mr. Porter did not preserve, even in light of his own comments at the hearing, where he said it should only be my conduct, and they've already made their alien argument, is that really the government's position? We took a conservative position based on Peltier and the necessity for the specific argument to be raised in the district court. That's briefed in our brief, but the principal issue, regardless of error, plain, or just legal analysis, is which controls, conspiracy-wide or defendant-specific. Is this position, this problem that you have, is a national problem? Yes, and the court's position... And the position that you're taking is the position that the Solicitor General has taken on it? You have asked the Solicitor General for his position nationwide, and this is it? No, Your Honor. Well, don't you think you should? Your Honor, we know the department policy. All right. We did get approval to make this argument because we can't go against existing precedent, and if you find Turner Controls, that's the end of the story with the range because you have the outer limit, and that sets the mandatory minimum as well because they move together. They're married together, and the drug conspiracy presents the conundrum, and different circuits have found differently. Well, that's the problem, and on a clean slate here, never mind Turner, on a clean slate, what would be the government's position nationwide? On a clean slate, individualized sentencing, Your Honor. Okay. But we researched it. I mean, that is... Yes, Your Honor. Okay. But we don't feel like our policy can supersede controlling authority at this court, and that's why we're here. What's the circuit breakdown currently? The third... It's in footnote 24 of our brief. The third is conspiracy-wide. It was some unpublished decisions as well. The first, without considering the conundrum that I've talked about, said mandatory minimum is defendant-specific and statutory maximum is conspiracy-wide, so they're giving the jury a form with two things, and right now without a position from the court, we're doing it just to be on the safe side, but one of them is superfluous because the range is set by either the mandatory minimum or the statutory maximum. Could we end up in a situation where Mr. Iturres-Benea is differently situated than Mr. Haynes and Mr. Porter? Certainly, if you apply the plain error standard, the law is not clear. Alene says that the jury's got to make the finding on mandatory minimums. It's the mirror of a printing. Jury's got to make the finding, but neither of those considered the situation of the drug conspiracy and the lockstep congressionally set ranges that... If the first Randall had survived, it would be plain error. Randall, the first defendant-specific. Yeah, and so that would be plain error, and even Mr. Iturres-Benea would prevail with not preserving. It would be plain error. Well... But that's irrelevant because it doesn't survive. It's... Right. I mean, the reason I'm looking at you, Judge Elrod, is because I'm sure you're much more familiar with Randall than I am, but if it's defendant-specific and Randall is the law, then you have created the conundrum of a sentencing range that isn't authorized by Congress, and you are legislating a different range for Mr. Iturres-Benea's, for example, of zero to life, if the conspiracy-wide government. Are you going to talk about what the harm... If we were to evaluate the main merits of claims on harmless error, how you win, if you do win? On the expert issues? Yes. Are you addressing those, too, with your time? Yes, Your Honor. Or is someone else addressing those? You're addressing those? Yes, I'm addressing those, too. Let me just mention, as to sufficiency, these are jury arguments. They were all presented to the jury. There were three... There were three defense counsel on cross-examination that fully crossed Agent Lockhart, first in the voir dire, and then the judge gave an instruction, and then... I'm sorry. I just jumped to the expert testimony, and let me continue there. Then all of the defense counsel thoroughly crossed Agent Lockhart. As to the individual defendants, they were all three attorneys during a nine-day trial in which 15 law enforcement agents testified. With respect to Mr. Porter, co-conspirator Mackenzie Weber said, T is Porter. I don't know any other T. When I was at Mark Guyton's, he twice said, I saw the transaction. When he explained, it appears that it was more from an inference, but that was all presented to the jury. There was a thorough cross-examination of Mr. Weber on T, of Agent Lockhart on T. It was all closing argument on T, and we have in our brief the sufficiency arguments. I think it makes sense to turn to the expert issue because this is an issue where, and this court's recognized this, there isn't a clear line. Rule 702 gives a law enforcement agent as an example of a witness. In the 2000 Advisory Committee comments, it says, for example, and this is specialized testimony, when a law enforcement agent testifies regarding code words in a transaction, the principle is that the participants use code words to conceal, and an agent with extensive experience can analyze the conversations. This court in Griffith said, specialized jargon is endemic to the drug industry, to conceal the meaning of words to outsiders by deliberate obscurity. The first point there is that expert or lay, somebody needs to help the jury understand or else the drug dealers win because they get away with their code, the jury has no idea what they're talking about, and it just . . . this court and Rule 702 have recognized that this is a helpful area of testimony. Why is this call for an expert? Why can't an agent that is fully versed in the transaction at issue, all the multiple transactions, testify how he listened to 10,000 phone calls or however many the number, and this is what he has figured out these things mean? Why is that an expert? Why is that not just a fact witness? Well, Your Honor, when we've presented lay opinion testimony, it's not just a fact witness. The defense has argued in Aikens, for example, that we should have designated the law enforcement agent as an expert, and the court found the lay opinion was okay, but when he strayed into expertise, the court looked at it on the basis of harmless error or plain error, depending on the case. So we're criticized for lay opinion. We were coming off Judge L. Roddy Harris when we had a lay opinion, and we had been criticized for the way we presented the lay opinion, so we made the decision based on 702, based on Griffith, based on the unpublished decision in Palmer, to qualify the agent as an expert, and he was properly qualified, and there was thorough cross-examination before the jury on his qualifications that there were no articles, there's no school for drug code, there's no trophies for being the best at drug code, because as Judge Malazzo said, it wouldn't stay drug code for long. And that makes it difficult to prove that it's this type of rigorous science. This case is different than the other cases where we have said it was expert, because those actually did have some sort of science bolstering them, and this one doesn't. So I'm wondering about saying that means something other than that, or it means it. It seems to me that it's a lay testimony, because I've listened to so much, I've been listening to all these conversations, so I know that that means this, or it means this, but it's not an expertise of linguistics or something. Well, Your Honor, it actually has been recognized as a law enforcement's on-the-job training experience in the Advisory Committee Notes to Rule 702. It's given as an example of the specializing wiretap. Listen to all the conversations. Isn't that really not this sort of thing with that? Isn't that really like a certain amount of drugs? You cut a drug a certain way, and the drug is called this on the street? That's all about the drug trade itself, not on this particular day when Mr. Smith said seafood, he meant cocaine, or he meant heroin, or he meant marijuana, or he meant seafood. Well, Your Honor, this Court has recognized the specialty of drug code, and Undercover Agent Jackson testified that drug dealers use code to conceal. They use pronouns, and that's in the case law as well, to conceal. How else will the jury have a clue what put that means? Without this testimony, the jury would have to listen to 40,000 calls to figure it out. Wouldn't this be rejected in the D.C. Circuit, the Second Circuit, or the Sixth Circuit? Your Honor, this Court has said there's no clear line of demarcation, and the courts are not in agreement as to what exactly the line is. I don't know why you're about to run out of your time, and I don't think we've ever answered the question of whether it's harmless. I guess, as to Porter, did McKenzie Weber see Guyton purchase nine ounces of heroin from Porter, or is that not true? Weber testified that he saw the drug transaction. That's on page 2515. Agent... But he didn't see Mr. Porter. He just saw a car, which was not known to belong to Mr. Porter. Is that true in the reply brief where it says that? When he explained, yes, but there was much conversation about T. The only person Weber knew as T was Porter, and there was testimony from Tiffany Keyes, who was very familiar with Porter. She was not involved in the drugs, but she said not only was Porter known as T, but little B, who you'll see referred to in the conversations that are outlined in our brief, little B was his stepson, Brian. That was a witness who was just familiar with the players, and she said T is Porter, because his middle name is Terrell, and his stepson is known as little B. Also, Your Honor, if I can just... May I quickly summarize? You may, quickly. Okay. Fifteen law enforcement agents testified over nine days. There was electronic surveillance evidence. There was physical evidence. There was $90,000, unexplained wealth, 400 grams of heroin in a drug press. This case involved heroin, by the way. That was it. There was co-conspirator testimony. There was 40,000 conversations, 100 played to the jury, many of them without objection. As in Harris, the jury had a lot of conversations that went in without objection that it could consider. All right. I believe you've... Okay. Thank you, Your Honor, and thank you for the additional time. I appreciate it. Thank you, Ms. Copes. Mr. Burleigh? You would think with all of that, they would have had some evidence against my client. Basically, the only response we hear is that the jury got to hear this evidence, but that's obviously not how we evaluate sufficiency. What about the co-conspirator saying, the only T I know is your client? Isn't that enough itself? I have two responses to that. I don't know that he actually said the only T I know, but what difference does that make? What he said was, I know Mr. Porter goes by the name T or Tom. Of course, nobody's come up with Tom before. What does that mean? That can only mean he doesn't know Terrence Henderson, because we know Terrence Henderson goes by T. Mackenzie Webber does not know my client. He says he doesn't know my client. He's never talked to my client. He doesn't even recognize his voice. The other thing I want to say is, the woman who testified about Mr. Porter going by the nickname T did not, and if I'm wrong, I apologize, but she did not say Mr. Porter has a stepson named Little B. She didn't say it. She said Mr. Porter has a stepson named Brian. There is a reference to a person with a stepson, his little stepson named Little B. Now, if Brian is Little B, and there's no evidence that Brian is called Little B, then this Little B, this little stepson is 16 or 17 years old, which we would argue doesn't allow you to conclude that that's the Little B they're talking about, and that therefore Mr. Porter is T. All right. Thank you. Mr. Syberg? Thank you, Your Honor. Regarding the expert testimony question, the question you have to ask is, what is the basis for the interpretation? Is it a specialized knowledge? Is it something that he knows, the way crawfish is used on the street? No, it's not. It's the inference the government drew from its review of this evidence, and they get the benefit of the government putting its imprimatur on its interpretation of the evidence and having that called before the jury an expert interpretation. And they repeat that in their own closing argument at page 3130 of the record. Regarding the advisory committee notes, I would just point you to Justice Scalia's concurring opinion in TOME, T-O-M-E, the United States. I'm sorry, I don't have the citation, but he explains the limited usefulness of advisory committee notes. Regarding the sentence, the maximum does not set the minimum. The drug quantity sets the minimum and the maximum. And I appreciate opposing counsel's desire to have the same test apply to both, since both are driven by the same drug quantity finding. But there's an easier way out of the conundrum. The way is to look at Pinkerton. That is the conceptual basis behind Ruiz, because it's a question of statutory interpretation. What does the statute say? The statute says that any person who conspires to commit a drug offense shall be liable for punishment for the offense that, quote, was the object of the conspiracy. Whose object? The object of the person being punished. It's plain statutory interpretation. And because of that and because Ruiz answers that question in a way that makes sense, it's certainly the one that controls, especially for Mr. Haines' case, which doesn't even involve a maximum, but involves a minimum. Thank you, Your Honor. All right. Thank you, Mr. Seibert. Ms. Conner? Thank you. And just to pick off where Mr. Seibert left off, in a drug conspiracy case, it's the individual drug quantity which determines the penalty and shifts it or aggravates it. And the apprendee requires the drug quantity, individual drug quantity, be a fact found by the jury. And as Justice Thomas stated in Alleyne overturning Harris, which made a distinction between mandatory minimums and statutory maximums, there's no principal distinction for treating those two separately or differently. Does your client have maximum and minimum? I can't remember. Does he have maximum and minimum? He was sentenced to 292 months. He doesn't have a minimum. The claim you made about Mr. Haines, and so we don't have the problem with the superfluous, does that apply to your client as well? No. Okay. What do you know about Mr. Porter? I don't. Minimum. And I would say, for the same reasoning, underlying Randall 1, Mr. Porter has failed to plan error relief on the sentencing issue, but even if he isn't failing to object to the aggravation of the statutory max, a sentence in excess of the statutory max was prejudicial in his case. Thank you. All right. Thank you. Ms. Conner, your case is under submission. We noticed that you and Mr. Burley are court-appointed, and we wish to thank you for your willingness to take the appointments and for the good job you've done for your clients. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.